IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| Tonya Lewis, in re: | ) | |
| Yitavia Valentine, a minor, | ) | C/A No. 3:05-01676-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Plaintiff Tonya Lewis filed a complaint in the Court of Common Pleas for Richland County, South Carolina, on April 7, 2005, alleging that her week-old daughter, Yitavia Valentine, was injured on September 17, 2002 during her newborn checkup at Brookland Cayce Pediatrics, a pediatrics clinic owned and operated by Eau Claire Cooperative Health Center, Inc. ("Eau Claire"). Plaintiff alleges that Patricia Lucas Risinger, M.D., a pediatrician, struck Yitavia's left eye with a silver nitrate stick during an examination. Plaintiff alleges that Dr. Risinger's act caused Yitavia to suffer a corneal burn and subsequent scarring. Plaintiff asserts a cause of action for negligence and seeks actual and punitive damages.

At the time of the underlying events, Eau Claire was an entity receiving federal grant money from the United States Public Health Service pursuant to 42 U.S.C. §§ 254b, 254c, 256, or 256a. The United States Department of Health and Human Services deemed Eau Claire and its employees to be employees of the federal government for purposes of coverage under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, et seq. See 42 U.S.C. § 233(h). The United States removed the

action to the United States District Court for the District of South Carolina on June 13, 2005, pursuant to 42 U.S.C. § 233(a) and (c) and 28 U.S.C. § 2679(d)(2). The United States filed a motion to be substituted as a defendant in place of Eau Claire (Entry 4). The court granted the United States' motion on July 7, 2005.

A bench trial was held on December 19, 20, and 21, 2007. Prior to trial, the United States filed two motions in limine: (1) Motion to Exclude the Testimony of Plaintiff's Expert Dr. Thomas Armsey (Entry No. 114); and (2) Motion to Exclude Testimony or other Evidence of Negligence Based upon Failure to Provide Informed Consent (Entry No. 115). The court took these motions under advisement and allowed testimony notwithstanding these motions. The court will rule on the motions prior to articulating its findings of fact and conclusions of law.

A.    Motion to Exclude the Testimony of Plaintiff's Expert Dr. Thomas Armsey

The United States asserts that the testimony of Dr. Armsey, Plaintiff's expert witness and a physician, board-certified in family practice, should be excluded because it is not reliable under Fed. R. Evid. 702. Rule 702 provides:

> Testimony by Experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The United States asserts that Dr. Armsey's testimony is not reliable because he did not prepare or participate in the preparation of his second expert report; that he did not have possession of all the documents cited as the bases for his second report; and that he has abandoned some of the opinions expressed in his affidavit. The court concludes that the United States' arguments go to the

2

weight of the evidence and not its admissibility. The court notes that the case proceeded as a bench trial and the court is capable of hearing the testimony and according it the proper deference. The motion to exclude testimony of Dr. Armsey is denied.

B.     Motion to Exclude Testimony or other Evidence of Negligence Based upon Failure to Provide Informed Consent

On June 14, 2004, Plaintiff filed a Standard Form SF-95, Claim for Damage, Injury or Death under the FTCA, as follows:

> Claimant umbilical cord was swabbed with a silver nitrate stick struck the left eye of the claimant causing eye damage. The medical professional failed to adhere to the standard of care and failed to properly administer a clinical compound to the claimant.

Defendant's Exh. No. 1.

Prior to trial, Plaintiff indicated her intent to argue that Dr. Risinger was negligent for failing to properly inform Plaintiff of the risks associated with the use of silver nitrate. The United States moved to exclude Plaintiff's theory regarding informed consent. The United States contends that the SF-95 put the government on notice only that Dr. Risinger allegedly injured Yitavia by negligently striking her in the eye, and not that Dr. Risinger failed to adequately inform Plaintiff regarding the cauterization procedure.

The FTCA requires that a claim against the United States is barred unless it is presented in writing to the appropriate federal agency within two years after the claim accrues. 28 U.S.C. § 2401(b). Final disposition of the claim by the appropriate agency is a prerequisite to filing a civil action. 28 U.S.C. § 2675(a). The Court of Appeals for the Fourth Circuit has observed that "the requirement of filing an administrative claim is jurisdictional and may not be waived." Ahmed v. United States, 30 F.3d 514, 516 (4th Cir. 1994) (quoting Henderson v. United States, 785 F.2d 121,

123 (4th Cir.1986)).  The claim must be sufficient to enable the agency to investigate and place a sum certain value on the claim.  Id. at 517 (quoting Adkins v. United States, 896 F.2d 1324, 1326 (11th Cir.1990)).

With regard to the allegations of negligence based upon lack of informed consent, the court finds that Plaintiff failed to exhaust her administrative remedies because Plaintiff's Form SF-95 does not place the United States on notice of a claim of negligence based upon lack of informed consent. Accordingly, the court lacks subject matter jurisdiction over this claim.  The court grants the United States' motion to exclude testimony or other evidence of negligence based upon failure to provide informed consent.

Moreover, even if Plaintiff had exhausted her administrative remedies with regard to the allegations of negligence based upon the lack of informed consent, Plaintiff could not prevail.  Under the doctrine of informed consent,

> a physician who performs a diagnostic, therapeutic, or surgical procedure has a duty to disclose to a patient of sound mind, in the absence of an emergency that warrants immediate medical treatment, (1) the diagnosis, (2) the general nature of the contemplated procedure, (3) the material risks involved in the procedure, (4) the probability of success associated with the procedure, (5) the prognosis if the procedure is not carried out, and (6) the existence of any alternatives to the procedure. The basis of the doctrine is the patient's right to exercise control over his or her own body by deciding intelligently for himself or herself whether or not to submit to the particular procedure.

Hook v. Rothstein, 316 S.E.2d 690, 694-95 (S.C. Ct. App. 1984) (citing Sard v. Hardy, 379 A.2d 1014, 1019 (Md. 1977); 61 Am. Jur. 2d Physicians, Surgeons, and Other Healers § 187, at 318).  As in other cases involving medical practice, when a patient alleges that he has been injured because he has not been advised of the risks and benefits of a procedure, the factfinder must determine whether, under the facts of the case, the physician has deviated from the standard of care of the

reasonable practitioner. Id. at 696-97 (quoting Woolley v. Henderson, 418 A.2d 1123, 1130 (Me. 1980)). Because the question of whether the physician has acted unreasonably often involves the exercise of medical judgment, expert medical testimony is necessary to establish negligence in failing to adequately disclose risks to the patient. Id. at 697.

In this case, Plaintiff's expert witness, Dr. Armsey, testified that Dr. Risinger breached the applicable standard of care by failing to inform Plaintiff that the cauterization would destroy tissue and could cause scarring, and that infection could occur. Bench Trial Transcript (Entry 134), p. 280. According to Dr. Armsey, Dr. Risinger's statement to Plaintiff that silver nitrate does not burn was false. Id., p. 281.

Dr. Risinger testified she told Plaintiff that silver nitrate is

a chemical that basically kills off the blood vessels inside of that umbilical granuloma. If there's no blood vessel here the tissue can't grow, it basically dies and it shrivels up. But the medicine stains it a silver-gray color, almost like Betadine stains things kind of a brownish-orange color. Same principle. It doesn't burn, it doesn't hurt [because] [t]here's no nerve endings there, there's no sensation.

Bench Trial Transcript (Entry 135), p. 435. According to Dr. Risinger, she used the term "burn" in layman's terms, meaning "burn" as anything that would cause Yitavia pain. Id., pp. 435-36. Based on the information provided to her, Plaintiff consented to the cauterization. Id., p. 436.

The court concludes that, had informed consent been a viable issue, Plaintiff failed to establish that Dr. Risinger breached the standard in providing informed consent.

The court turns to the merits of the case.

## FINDINGS OF FACT

1.    Yitavia Valentine was born on September 10, 2002. Bench Trial Transcript (Entry 133), p. 104. On September 17, 2002, Plaintiff Tonya Lewis presented Yitavia at the Brookland

Cayce Pediatrics clinic (the "Clinic") for a newborn check-up. Id. The appointment was scheduled for 10:30 a.m. Id., p. 105; Defendant's Exh. No. 7.

2. Plaintiff signed a sign-in sheet signifying her arrival at the Clinic at some time between 10:15 a.m. and 10:35 a.m. on September 17, 2002. See Defendant's Exh. No. 6. Catherine McKay, a nurse at the Clinic, escorted Plaintiff and Yitavia to an examination room. Bench Trial Transcript (Entry 135), p. 383. McKay obtained Yitavia's weight and measurements, completed the medical record sheet for the baby's first week visit, and obtained a family and birth history, feeding schedule, and other pertinent information. Id., pp. 383-88; Defendant's Exh. No. 2. McKay then placed Yitavia's chart in a tray on the door to the examination room and put up a flag up indicating that Yitavia was ready for examination by her pediatrician, Patricia Lucas Risinger, M.D. Bench Trial Transcript (Entry 135), p. 386.

3. Dr. Risinger thereafter entered the examination room and introduced herself to Plaintiff. Dr. Risinger reviewed with Plaintiff the information obtained by McKay. She reviewed birth and growth parameters with Plaintiff. Id., p. 430. Dr. Risinger proceeded with the physical exam by laying Yitavia lengthwise on the examining table. Dr. Risinger stood facing the torso of the baby. Id., p. 431. Dr. Risinger started the examination from the top of the head and proceeded to check the eyes, ears, oral cavity, heart, lungs, abdomen, umbilicus, female anatomy, and limbs. Id., pp. 431-32. Dr. Risinger checked the skin and conducted a neurological examination. Id., p. 432. Dr. Risinger noted a small umbilical granuloma, which is an extra piece of tissue that may grow around the base of the belly button. An umbilical granuloma usually is wet and oozing. Id., p. 434.

4. Dr. Risinger explained to Plaintiff that Yitavia was growing well. She also explained

to Plaintiff that Yitavia's belly button had a granuloma, and its presence would prolong the separation of the belly button cord from the skin itself.  Id., pp. 433-34.  Dr. Risinger told Plaintiff that the usual treatment involves cauterization of the granuloma by the application of silver nitrate, which burned the tissue but did not hurt the child in any way because there is no sensation in the stump.  Id.  Dr. Risinger told Plaintiff that the other option was to do nothing, but usually doing nothing would prolong separation and allow for possible infection.  Id., p. 435.  Plaintiff chose to proceed with the cauterization.  Id.

5.     Dr. Risinger left the examination room and retrieved two silver nitrate sticks from a canister in the Clinic laboratory.  Id., p. 436.  Silver nitrate sticks look like elongated matchsticks. At the end is a round tip containing silver nitrate.  Id.  The silver nitrate is ignited or activated when it becomes wet.  It leaves a silver-black stain for several days on whatever it touches.  Id., p. 449. Silver nitrate dries fairly instantaneously, within five to seven seconds.  Id.

6.     Dr. Risinger re-entered the room and showed Plaintiff the silver nitrate sticks.  Dr. Risinger washed and dried her hands and put on a pair of gloves.  Id., pp. 444-45.  Dr. Risinger picked up the two silver nitrate sticks and walked back to the examination table.  Id., p. 445.  As during the physical examination, Yitavia was lying lengthwise on the table.  Dr. Risinger stood facing Yitavia's torso.  Yitavia's head was to Dr. Risinger's left and her feet to Dr. Risinger's right. Id.  Plaintiff stood on Dr. Risinger's right side in order to watch the procedure.  Id.

7.     Dr. Risinger laid one silver nitrate stick next to Yitavia's chest.  Dr. Risinger used her left hand to brace and shield Yitavia.  Using her right hand, Dr. Risinger applied the silver nitrate on the umbilical granuloma.  Dr. Risinger laid the used silver nitrate stick on the table, across Yitavia's hip away from the head.  Id., p. 446.  Dr. Risinger repeated the procedure.  She then picked

up both sticks, drew her hand back across the table, below Yitavia's hip, and told Plaintiff that she was finished.  Id.  Dr. Risinger disposed of the used silver nitrate sticks and her gloves in a trash can on the other side of the room.  Id., p. 447.  When Dr. Risinger left the room, Plaintiff was holding Yitavia, who was not crying.

8.    Dr. Risinger testified that silver nitrate, when wet, leaves a stain that "is there for weeks, days and days and weeks."  Id., p. 450.  Subsequent to the procedure, Dr. Risinger saw no evidence of a silver nitrate stain anywhere on Yitavia but on the granuloma.  Id., p. 450.  There were no marks on the table paper.  Id.  Dr. Risinger completed the chart which included an order for a hepatitis B shot to be given by McKay.  Id., pp. 452-53.

9.    McKay re-entered the examination room to give Yitavia her inoculation.  Yitavia was nursing and was not crying.  Id., pp. 391-92.  Plaintiff expressed no complaints about the application of the silver nitrate to McKay.  Id., p. 393.  Yitavia was crying after the vaccination.  Id., p. 393.  McKay had Plaintiff and Yitavia remain in the examination room for the purpose of monitoring Yitavia for any adverse reaction to the injection.  Id., p. 392.

10.    After approximately fifteen to twenty minutes McKay went back to the examination to check Yitavia.  She instructed Plaintiff to go to the front desk to make her next appointment.  Id., p. 393.

11.    As Plaintiff was checking out, Plaintiff approached McKay in the hall and reported that something was wrong.  Plaintiff complained that Yitavia did not start crying until after the silver nitrate had been applied to the umbilicus.  Id., p. 394.  McKay asked Lewis to have a seat in the well child waiting room.  McKay then relayed Plaintiff's complaint to Dr. Risinger.  Id.  Dr. Risinger stated that silver nitrate did not sting or burn.  McKay relayed Dr. Risinger's statement to Plaintiff.

Id., pp. 394-95, 453.

12.     McKay informed Plaintiff of Dr. Risinger's response, and Plaintiff told McKay that the silver nitrate had been applied to Yitavia's eye. Id., pp. 395, 455. After reporting this complaint to Dr. Risinger, McKay and Dr. Risinger went to the well child waiting room to check on Yitavia. Id. Plaintiff then told McKay and Dr. Risinger that Yitavia had been struck in the eye with the wooden end of the silver nitrate stick. Id., pp. 395, 456. Dr. Risinger looked at the baby and noticed no obvious silver-black streak on the face, anything near the eye, on the eyelid, or on the inside of the nose. Id., p. 456.

13.     Dr. Risinger offered to recheck the child and requested Plaintiff to wait until Dr. Risinger dismissed her current patient. Id., pp. 396, 458. After waiting about five minutes, Plaintiff told the receptionist that Yitavia had calmed down and they were leaving. Id.

14.     The Clinic closes for lunch from 12:15 p.m. to 2:00 p.m daily.

15.     Plaintiff took Yitavia to the Lexington Medical Center Emergency Room at 1:17 p.m. on September 17, 2002, where she was seen by Sean O'Meara, M.D. Bench Trial Transcript (Entry 134), p. 345. Yitavia was crying forcefully. Id., p. 344. Plaintiff told Dr. O'Meara that a silver nitrate stick had struck Yitavia's left eye while she was at a pediatrician's office. Id., p. 343. Dr. O'Meara placed tetracaine ophthalmic solution in Yitavia's left eye to numb the tissue. He irrigated the eye with Dacriose, and put fluorescein stain in the eye to highlight any injury to the cornea. Id. Dr. O'Meara noticed a disruption in the smooth covering of the cornea. Based on the history he was given by Plaintiff, Dr. O'Meara treated the eye by flushing it with the Dacriose. Dr. O'Meara discharged Yitavia at 2:12 p.m. and referred her to an ophthalmologist, John Wells II, M.D. Id., pp. 349-50. Plaintiff took Yitavia to Dr. John Wells' office on September 17, 2002, where she was

examined and given a topical antibiotic and steroid.  Bench Trial Transcript (Entry 133), p. 49.

16.     Dr. Wells referred Yitavia to Janette E. White, M.D. a pediatric ophthalmologist. Dr. White testified that she first examined Yitavia on October 25, 2002.  Id., p. 49.  Dr. White found a faint corneal scar on the inside lower part of Yitavia's left eye.  Dr. White also diagnosed astigmatism in Yitavia's left eye, which placed her at increased risk of amblyopia, also known as "lazy eye."  Id., pp. 51-52.  Dr. White subsequently examined Yitavia on January 31, 2003 and May 30, 2003, and noted no change in Yitavia's condition.  Id., pp. 54.

17.     Dr. White next examined Yitavia on January 4, 2004.  Yitavia's left eye continued to show the scar, which was stable.  Yitavia's right eye was normal.  The left eye showed some nearsightedness and astigmatism.  Id., p. 55.  Dr. White noted asymmetry in the refractive error that could lead to amblyopic eye.  Accordingly she prescribed glasses to help the vision in the left eye to develop.  Id.  Dr. White next examined Yitavia on June 4, 2004.  Yitavia continued to have a corneal scar and some irregularity but was doing well with glasses.  Id., p. 56.

18.     Dr. White last examined Yitavia on November 7, 2007.  Yitavia continues to have a small scar on the front part of her left eye that has caused approximately ten to twenty percent thinning to the front part of the eye as well as the cornea.  Dr. White measured the scar at just under three millimeters by two millimeters.  Id., p. 61.  Dr. White continued to recommend that Yitavia wear her glasses full time.  Dr. White noted that further treatment may be necessary in the form of either patching or atropine penalization to force Yitavia to use her non-preferred left eye.  Id., pp. 68-69.

## Analysis of Disputed Facts

1.     To make its factual findings, the court was required to weigh the credibility of the

Plaintiff and Dr. Risinger in order to resolve disputed facts regarding Dr. Risinger's method of applying the silver nitrate.

2.      Plaintiff testified at the bench trial that she arrived at the Clinic around noon; that Dr. Risinger, when it came time to apply the silver nitrate sticks, wet the sticks at the sink; that Dr. Risinger stood behind Yitavia's head with one silver nitrate stick in each hand; that she reached over Yitavia's head  to swab the umbilical granuloma; that Dr. Risinger swabbed the umbilicus with a stick in one hand and flipped the stick back toward her chest, and then swabbed the site with the second stick using the other hand.  Bench Trial Transcript (Entry 133), pp. 106, 154, 159.  Plaintiff testified that she held Yitavia's legs, and that Dr. Risinger never put her hand on Yitavia's body to hold her still or restrain her arms.  Id., pp. 154-55.

3.      Dr. Risinger testified that she was not trained to cauterize an umbilical granuloma by placing the baby with the head facing her torso, and she has never cauterized an umbilical granuloma in that manner.  Transcript of Bench Trial (Entry 135),  p. 451.  Dr. Risinger performs the procedure facing the side of the baby because it is not possible to reach over a baby's head to accurately place the silver nitrate on the umbilical granuloma.  Dr. Risinger always uses the same method to apply silver nitrate to an umbilical granuloma, so that the parents can watch as she applies the silver nitrate, and so she can hold onto the baby with one hand.  Id., p. 452.  According to Dr. Risinger, she "would not be able to hold onto the baby's head, reach across the baby's head, apply silver nitrate to one area on the body with a squirming wiggling baby and be able to do it accurately."  Id.  Dr. Risinger has performed the procedure hundreds of times.  Id., p. 468.  Dr.  Risinger does not apply water to the silver nitrate sticks because the moist tissue of the umbilical granuloma activates the sticks.  Id., p. 502.

4.     The court, having viewed Plaintiff at trial and considered her testimony, finds Plaintiff to be not credible.  Plaintiff had no explanation for the difference between the time shown on the Clinic's check-in sheet and her testimony that she arrived for her appointment around noon, when the Clinic was closed for lunch.  There exists an unexplained time lapse between Plaintiff's 10:35 a.m. arrival and her trip to the emergency room around 1:00 p.m. that is inconsistent with Plaintiff's contention that Yitavia's eye required immediate care after the examination by Dr. Risinger.  Plaintiff testified that McKay administered the inoculation prior to Dr. Risinger's examination of Yitavia, contrary to testimony of both Dr. Risinger and McKay that inoculations cannot be given by a nurse until authorized by a physician.  Plaintiff averred that Yitavia did not cry after her shot, but cried furiously when the silver nitrate was applied.  Plaintiff also testified that Dr. Risinger wet the silver nitrate sticks prior to using them to reach over Yitavia's head to cauterize the umbilical granuloma.

5.     Plaintiff's explanation of the events of September 17, 2002 is inconsistent with a logical sequence for conducting a medical examination in general and the process for applying a substance to a baby's umbilicus in particular.  For this reason, the court has rejected Plaintiff's version of the facts surrounding Dr. Risinger's alleged misconduct.

## CONCLUSIONS OF LAW

1.     This court has original jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1331.

2.     The United States is the proper defendant in this action pursuant to 28 U.S.C. § 1346(b) and the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.  Pursuant to 42 U.S.C. § 233(h), the United States Department of Health and Human Services has deemed Eau Claire and its

employees, who are physicians, to be employees of the federal government for purposes of coverage under the FTCA. The United States was properly substituted for Eau Claire, which is an entity receiving federal grant money from the United States Public Health Service pursuant to 42 U.S.C. §§ 254b, 254c, 256, or 256a.

3.      Plaintiff has exhausted her administrative remedies as set forth in 28 U.S.C. § 2675 with regard to the claims set forth in her Standard Form SF-95.

4.      The FTCA directs the court to look to the law of the state where the act or omission occurred in order to determine whether a complaint in negligence warrants relief. Dumont v. United States, 80 F. Supp. 2d 576, 581 (D.S.C. 2000); Todd v. United States, 570 F. Supp 670, 677 (D.S.C. 1983). See also 28 U.S.C. § 2671.

5.      Under South Carolina law, a plaintiff bears the burden of proof of negligence, proximate cause and injury in a medical malpractice case. A plaintiff must prove through expert testimony and by a preponderance of the evidence the following: (a) the recognized and generally accepted standards, practices and procedures in the community which would be exercised by competent physicians in the same specialty under similar circumstances; (b) the physician in question negligently deviated from the generally accepted standards, practices, and procedures; (c) such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury; and (d) the plaintiff was injured. David v. McLeod Regional Med. Ctr., 626 S.E.2d 1, 4, (S.C. 2006).

6.      Negligence cannot be inferred from an injury or bad result. South Carolina law does not recognize the doctrine of res ipsa loquitur. See, e.g., Hadfield v. Gilchrist, 538 S.E.2d 268, 275 (S.C. Ct. App. 2000). Thus, "[t]he plaintiffs' burden of proof cannot be met by relying on the theory

that the thing speaks for itself or that the very fact of injury indicates a failure to exercise reasonable care." <u>Reiland v. Southland Equip. Serv. Inc.</u>, 440 S.E. 2d 887, 889 (S.C. Ct. App. 1998)).

7.     Negligence is not actionable unless it is a proximate cause of the injury complained of, and negligence may be deemed a proximate cause only when without such negligence the injury would not have occurred or could not have been avoided.  When one relies solely upon the opinion of a medical expert to establish a causal connection between the alleged negligence and the injury, the expert must, with reasonable certainty, state that in his professional opinion, the injuries complained of most probably resulted from the defendant's negligence.  <u>Ellis v. Oliver</u>, 473 S.E.2d 793, 795 (S.C. 1996).  The expert testimony as to proximate cause must provide a significant causal link between the alleged negligence and the injuries suffered, rather than a tenuous and hypothetical connection.  <u>Id.</u>

8.     Plaintiff presented the expert testimony of Thomas D. Armsey II, M.D.  Dr. Armsey's practice has been divided between primary care family practice and sports medicine.  Bench Trial Transcript (Entry 134), p. 223.  Dr. Armsey's recollection was that he had sometime within the last two years cauterized an umbilical granuloma on an infant.  <u>Id.</u>, p. 225.  He opined that he had performed ten  to fifteen such procedures between 2003 and 2006.   <u>Id.</u>, pp. 226-27.  He has cauterized no umbilical granulomas since July 2006.  <u>Id.</u>, p. 229.  Dr. Armsey has not written any medical articles regarding the care of infants.  <u>Id.</u>, p. 227.  He is not board certified in pediatrics.  <u>Id.</u>, p. 228.  He has had no specialized training in the treatment of infants and cauterization of granulomas.  His training has been the same training that all students in medical school receive.  <u>Id.</u>, p. 230.

9.     Although Dr. Armsey offered several opinions, the gravamen of his testimony at the

14

bench trial was that Dr. Risinger was careless and imprecise in (1) passing the silver nitrate sticks across Yitavia's body; (2) "flipping" the sticks; (3) failing to make certain the silver nitrate dried, possibly by blotting the treated area with a gauze pad; and (4) placing the silver nitrate sticks on the table where they could be inadvertently touched by the baby.  Id., pp. 292-93.

10.     Dr. Armsey subsequently stated that crossing the baby's body with a silver nitrate stick was not a breach of the standard of care.  Id., p. 324.  As to "flipping" the sticks, Dr. Armsey's opinion was based upon Plaintiff's recitation of the procedure, which the court has determined to be not credible.  Thus, this opinion does not establish a breach of the standard of care.

11.     With respect to Dr. Armsey's opinion that Dr. Risinger breached the standard of care by failing to make certain the silver nitrate was dry, Plaintiff denied that either she or Yitavia touched the umbilicus after the procedure.  Bench Trial Transcript (Entry 179).  Therefore, even if Dr. Risinger failed to ensure that the silver nitrate had dried completely,  Plaintiff has failed to establish that the failure proximately caused any injury to Yitavia.  With respect to Dr. Armsey's opinion that Dr. Risinger's placing the silver nitrate sticks on the examination table constituted a breach of the standard of care, the court finds credible Dr. Risinger's testimony that the silver nitrate sticks were not within reach of Yitavia.  Moreover, there is no evidence to support a finding that Yitavia came into contact with either stick.  There was no stain on the paper covering the examination table or on Yitavia's face or body.  Based on the facts found by the court and Dr. Armsey's lack of specialized training or knowledge in the area of pediatrics in general and cauterization of umbilical granulomas in particular, the court concludes that Dr. Armsey's expert opinion should be given little weight.

12.     The court further finds Dr. Armsey's opinion regarding the standard of care should

15

be given little weight because it is inconsistent with prior opinion testimony.  For example, in his Affidavit Opinion, Dr. Armsey testified that Dr. Risinger breached the standard of care in cauterizing an umbilical granuloma when she failed to use a gauze pad to dry the cauterized area.  Then, in his second deposition, Dr. Armsey testified that Dr. Risinger did not breach the standard of care when she failed to use the gauze pad.  Finally, before the court, he reverted to the opinion that Dr. Risinger breached the standard of care when she failed to use a gauze pad.

13.     The United States presented Patrice Gibson Chishom, M.D., a pediatrician, as an expert witness.  Transcript of Bench Trial (Entry 135), p. 517.  Dr. Chishom testified that she has performed hundreds of umbilical granuloma cauterizations.  Id., pp. 519, 520, 521.  Dr. Chishom testified regarding the standard procedure for cauterizing an umbilical granuloma with a silver nitrate stick.  Id., pp. 524-25.  Dr. Chishom testified that the stick may be dampened prior to use, depending upon the physician's training, but that she does not do so.  Id., p. 524.  Dr. Chishom testified that her standard procedure is to lay the baby on the table length-wise, usually with the head being to the left, and the legs to the right, or she might have the child sit in the mother's lap.  Id., p. 525.  She would apply the silver nitrate to the umbilical area where it was necessary, with the stick at all times being out of the area of the patient so the patient could not touch them.  Id.  Dr. Chishom testified that she has never known or been taught, seen, or used the procedure described by Plaintiff of placing the baby's head at the doctor's torso to cauterize the umbilical granuloma.  Id., p. 528.  Dr. Chishom testified that such a procedure is not practical or safe because (1) the baby could fall off the table; (2) it is difficult to be accurate when reaching over a baby's head and arms; and (3) there is a greater potential of touching a baby's head and arms with a nitrate stick while one is attempting to apply the substance.  Id., p. 528.  Dr. Chishom testified that, in her opinion, based upon a reasonable degree

of medical certainty, Dr. Risinger did not breach the applicable standard of care.  Id., p. 527.

14.    The court concludes that Plaintiff failed to establish by expert testimony the requisite elements of her medical malpractice claim: the standard of care for a pediatrician in this community in cauterizing an umbilical granuloma, a breach of that standard of care when Dr. Risinger cauterized the umbilical granuloma on Yitavia, or that any act or omission by Dr. Risinger proximately caused the injury sustained by Yitavia.  To the contrary, the credible and reliable testimony, exhibits, and other evidence in the record support a finding that Dr. Risinger utilized the recognized and generally accepted standards, practices and procedures that would be exercised by competent pediatricians under the circumstances present in this case.

### ORDER

For the reasons stated, judgment is entered in favor of the United States, and Plaintiff shall take nothing.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
United States District Judge

Columbia, South Carolina

August 21, 2008.

17